IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KATIE L. BOHN,

                                    Plaintiff,

         v.                                        Civil Action No.
                                                   7:10-CV-1078 (TJM/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

_____

APPEARANCES:                         OF COUNSEL:

FOR PLAINTIFF:

CONBOY, McKAY LAW FIRM               LAWRENCE D. HASSELER, ESQ.
91 Genesee St.
Geneva, NY 14456

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN            JASON P. PECK, ESQ.
United States Attorney for the       Special Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

         Plaintiff Katie L. Bohn, who suffers from several diagnosed physical

and mental conditions including, *inter alia,* bipolar disorder and obesity,

has commenced this proceeding seeking judicial review of an agency

determination denying her application for supplemental security income

("SSI") benefits, pursuant to section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g).  In support of her challenge to the agency's

denial of benefits, plaintiff argues that the finding of an administrative law

judge ("ALJ") assigned to hear and determine the matter, to the effect that

she was not disabled at any relevant time within the meaning of the Act, is

not supported by substantial evidence and that the ALJ should have

concluded that her bipolar disorder qualifies as disabling both under the

agency's listing of presumptively disabling conditions, and in any event

after applying the full disability analysis to the facts disclosed in the

record.

   Having carefully reviewed the evidence that was before the agency,

and despite applying the requisite deferential standard, I nonetheless

conclude that the ALJ's analysis of plaintiff's circumstances was flawed,

and that his finding that her mental condition is not disabling is not

supported by substantial evidence.

I.    BACKGROUND

   Plaintiff was born on June of 1980; at the time of the ALJ's decision

2

she was twenty-nine years old.  Administrative Transcript at pp. 56, 99, 562.[1]  Plaintiff is approximately five feet, seven inches tall and weighs two hundred thirty pounds.  AT 562.  Plaintiff lives with her mother and her two children, ages eight and ten, one of whom has been diagnosed as suffering from attention deficit hyperactivity disorder ("ADHD").  AT 563.  Plaintiff is a high school graduate.  AT 97, 565.

At the time of her hearing plaintiff was working on a part-time basis in a convenience store as a cashier.  AT 566.  Before that she worked at a dollar store, prior to being fired, and at an ice cream shop, in a position which she quit; both of those were part-time positions.  AT 93, 567-68.  Plaintiff also worked as a certified nurses aide ("CNA") for approximately four months at the Lowville Hospital, located in Lowville, New York.  AT 568.  Plaintiff left that CNA position upon being hospitalized for mental health reasons.  *Id.*

Over time plaintiff has suffered from multiple potentially limiting physical conditions.  Plaintiff has a history of experiencing renal stones, with evidence of nephrolithiasis.  AT 401-02; 418; 443.  Plaintiff is also

---

[1]     Portions of the administrative transcript of evidence and proceedings before the agency, Dkt. No. 9, filed by the Commissioner together with his answer, will be cited herein as "AT ___."

obese, her weight having fluctuated between as low as two hundred and

thirty pounds at the time of her hearing in November 2008 to a  recorded

high of three hundred and two pounds on December 19, 2003.  AT 426,

562.  Significantly, plaintiff did not claim these conditions either in her

application for benefits or at the hearing as substantially limiting her ability

to perform work-related functions.  AT 92, 583.

Of primary concern in this case is the plaintiff's mental condition,

which has been attributed at least in part to having been raped at the age

of fourteen, her involvement in several physically abusive relationships,

and having been traumatized as a teenager by the death of her five-year-

old sister in a house fire.  AT 142.  Plaintiff first sought inpatient

psychiatric treatment on June 13, 2001, shortly before her twenty-first

birthday.  AT 124-28.  On that occasion she was admitted to the St.

Elizabeth Medical Center in Utica, New York after attempting to commit

suicide by overdosing.  *Id.*  Upon admission, plaintiff was assessed as

suffering from depression with suicidal ideation, with an indication of

alcohol abuse.  AT 124, 128.  Plaintiff remained hospitalized for six days,

was discharged with a diagnosis of substance induced mood disorder,

alcohol abuse, and alcohol dependency, and was prescribed Celexa and

4

Trazodone.  AT 124.  Upon plaintiff's release plans were made for her continued treatment through an outside psychiatrist.  AT 124-25.

Plaintiff was again treated at the St. Elizabeth Medical Center in Utica, New York for a period of four days in May 2004.  AT 129-36. Plaintiff was admitted to the hospital with a global assessment of functioning ("GAF") score of thirty-five.[2]  AT 138.  It was noted at the time of her admission that plaintiff was having suicidal ideation, though with no specific plans.  During her psychiatric assessment the plaintiff stated "I was trying to kill myself, but I do not want to die and I cut myself though." AT 137; *see also* AT 198 (report dated May 28, 2004, noting an urge by the plaintiff to cut herself).  During this period of hospitalization plaintiff also acknowledged attempting to drive her car off a bridge in a suicide attempt for which medical attention was not sought.  AT 208.  Upon her discharge plaintiff was continued on her then-current medications, including Trazodone, Lexapro, and Seroquel.  AT 132.

Plaintiff underwent a third mental health hospitalization in May 2005

---

[2]    The GAF scale considers psychological, social and occupational functioning of an individual on a hypothetical mental health continuum.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Assoc. 4th ed. Text Revision 2000) ("DSM-IV-TR").  A person with a GAF of between 31 and 40 exhibits "[s]ome impairment in reality testing or communication, [or a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...".  *Id.*

when she was admitted to the Lewis County General Hospital for a

"suicide gesture" involving an attempted medication overdose.  AT 278-

92.  Upon her admission plaintiff was observed to be a depressed state,

and stated that she was not certain whether she wanted to end her life.

AT 283.

Plaintiff underwent a fourth episode of hospitalization when she was

admitted to St. Elizabeth's Medical Center for inpatient psychiatric

treatment for five days in January 2007.  AT 318-413.  Upon that

admission plaintiff was diagnosed with bipolar disorder and mood disorder

and assigned a GAF score of "thirty or below".  AT 326-28.  At the time of

her admission plaintiff tested positive for the presence of opiates and

additionally acknowledged her heavy use of alcohol.  AT 327.  Notes

associated with plaintiff's hospitalization on that occasion reflect a history

consistent with true paranoid psychotic ideation, including a rambling

manic thought process with homicidal ideation over the prior three weeks,

and a feeling of being extremely depressed.  AT 378.  Those reports also

describe the plaintiff as a "chronic cutter" and note that while the cutting

had subsided it appeared that the plaintiff may have substituted tattooing

for cutting as a means of hurting herself.  AT 326.

Plaintiff was hospitalized yet again in October of 2007 at the Lakeland Regional Medical Center in Lakeland, Florida, where she underwent ten days of treatment.  AT 466-526.  At the time of her admission plaintiff expressed suicidal and homicidal threats and was initially diagnosed with bipolar disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder.  AT 468-69.  Plaintiff again tested positive for the presence of opiates, and her history of abusing prescription medications was noted.  AT 466.  Upon admission plaintiff was assigned a GAF score of 30, although by the time of her discharge that score had increased to forty-five.[3]  AT 466, 469.

In addition to her five documented periods of hospitalization plaintiff has received mental health counseling and treatment over time, principally through the Lewis County Community Mental Health Center where she was a regular patient between August 2001 and July 2007, and again in February 2008.  Over a five-year period between September 2001 and September of 2006 plaintiff visited with a psychiatrist at the Center on at least forty-seven occasions.  AT 236-55, 444-65.  During the course of

---

[3]      At the time of her hospitalization in Florida plaintiff was living in Lakeland, Florida with her ex-boyfriend's sister, having left New York and taken her two young children with her.  AT 468.

that treatment plaintiff's psychiatrist attempted to control her symptoms

using a combination of mood stabilizers, anti-psychotics, and anti-

depressants, including Effexor, Trazodone, Depakote, Vistaril,

Resperidone, and Strattera.  AT 454.   While noting that some of those

medications have helped improve the plaintiff's mental health condition on

a temporary basis and may have lessened her depression, her treating

psychiatrist also observed that they did not address her irritability and

impulsivity.  AT 452.

Plaintiff also sought psychiatric treatment in late 2007 and early

2008 from Mid-Florida Medical Services.  AT 527-42.  There she was

treated for bipolar disorder and PTSD and was continued on various

medications including Depakote, Trazodone, and Effexor.  *See id.*  During

the course of her treatment at Mid-Florida Medical Services, plaintiff's

GAF score was never reported to be higher than fifty-four.  *See id.*

In addition to her hospitalizations and other treatment, plaintiff was

consultatively evaluated by Jeanne Shapiro, Ph.D., a psychological

consultant, on November 14, 2006.  AT 293-97.  Based upon her

examination, Dr. Shapiro diagnosed the plaintiff as suffering from bipolar

disorder not otherwise specified ("NOS") and panic disorder, additionally

noting that borderline personality disorder and borderline intellectual

functioning should be ruled out.  AT 296.  Dr. Shapiro reported the plaintiff

was oriented times three, with intact attention and concentration as well as

recent and remote memory skills, but noted that "[h]er intellectual

functioning is estimated to be in the low average to borderline range."  AT

296.  He also rated her insight and judgment as both being "poor."  AT

295-96.  Addressing plaintiff's employment potential, Dr. Shapiro noted

the  following:

> Vocationally, the claimant appears to be capable of
> understanding and following simple instructions
> and directions.  She appears to be capable of
> performing simple and complex tasks with
> supervision and independently.  She appears to be
> capable of maintaining attention and concentration
> for tasks.  She can regularly attend to a routine
> and maintain a schedule.  She appears to be
> capable of learning new tasks.  She appears to
> have difficulty consistently making appropriate
> decisions.  She appears to find it difficult to relate
> to and interact appropriately with others.  She
> appears to have some difficulty adequately dealing
> with stress.

AT 296.  Based upon her evaluation, Dr. Shapiro recommended that

plaintiff continue treatment and assessed her prognosis as "poor".  AT

297.

9

II.     PROCEDURAL HISTORY

A.      Proceedings Before The Agency

Plaintiff filed an application for SSI benefits under the Act on September 15, 2006, initially claiming to have been disabled as of April 1, 2002 but later amending that to claim a disability onset date of January 1, 2005.  AT 56-60.  After her application was initially denied, AT 44-51, plaintiff requested and was afforded an evidentiary hearing before ALJ Robert E. Gale on September 25, 2008 to consider her eligibility for benefits.  AT 559-89.  Following that hearing, at which plaintiff was represented by counsel, ALJ Gale issued a decision on March 18, 2009 finding that the plaintiff is not disabled and therefore not entitled to receive SSI benefits.  AT 15-29.

In his decision ALJ Gale applied the now familiar, five-step test for determining disability, concluding initially at step one that while she has worked, plaintiff has not engaged in employment rising to the level of substantial gainful activity.  AT 20.  At step two the ALJ next found that plaintiff suffers from severe impairments, including bipolar disorder, panic disorder, and opiate dependency, reported to be in early remission, but rejected obesity, plaintiff's history of renal stones, and alcohol

10

dependence as qualifying at step two as sufficiently severe.  AT 20-23.
The ALJ concluded at step three that plaintiff's severe impairments
nonetheless do not meet or medically equal any of the listed,
presumptively disabling impairments set forth in 20 C.F.R. Pt. 404, Subpt.
P, App. 1.  AT 21-22.

Before proceeding to step four of the disability protocol ALJ Gale
surveyed the evidence before him and concluded that despite her
conditions the plaintiff retains the residual functional capacity ("RFC") to
perform work at all exertional levels and can 1) understand, remember,
and perform simple and some more complex tasks independently and with
supervision; 2) maintain attention and concentration for tasks; 3) attend to
a routine and maintain a schedule; 4) learn new tasks; and 5) work in a
low stress environment defined as entailing occasional changes in the
work setting.  AT 23.  After concluding at step four that plaintiff has no
past relevant work, AT 28, the ALJ went on to apply his RFC finding to the
medical–vocational guidelines (the "grid") set forth in 20 C.F.R. Pt. 404
Subpt. P, App. 2, concluding under section 204.00 of the grid that a
finding of no disability is warranted and, thus finding that plaintiff is not
entitled to receive SSI benefits.  AT 28-29.

The ALJ's decision became a final determination of the agency on

May 15, 2009, based upon a decision from the Social Security

Administration Appeals Council denying plaintiff's request for review of

that opinion.  AT 4-6.

B.    <u>This Action</u>

Plaintiff commenced this action on September 8, 2010.  Dkt. No. 1.

Issue was thereafter joined on January 4, 2011 by the filing an answer on

behalf of the Commissioner, followed the next day by submission of an

administrative transcript of the proceedings and evidence before the

agency.  Dkt. Nos. 8, 9.  With submission of plaintiff's brief on March 25,

2011, Dkt. No. 12, and that on behalf of the Commissioner on May 9,

2011, Dkt. No. 14, the matter is now fully briefed and ripe for

determination and has been referred to me for the issuance of a report

and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(d).[4]  *See also* Fed. R. Civ. P. 72(b).

---

[4]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 19, 2001.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

III.   DISCUSSION

A.   Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817

F.2d 983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to

whether the Commissioner applied the proper legal standards, his

decision should not be affirmed even though the ultimate conclusion

reached is arguably supported by substantial evidence.  *Martone*, 70 F.

Supp. 2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the

correct legal standards have been applied and the ALJ's findings are

supported by substantial evidence, those findings are conclusive, and the

decision should withstand judicial scrutiny regardless of whether the

reviewing court might have reached a contrary result if acting as the trier

of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d

13

Cir. 1988); *Barnett v. Apfel,* 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998)

(Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197,

229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184

(2d Cir. 2003).  To be substantial, there must be "'more than a mere

scintilla'" of evidence scattered throughout the administrative record.

*Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427 (quoting *Consolidated*

*Edison Co.*, 308 U.S. at 229, 59 S. Ct. 219); *Martone,* 70 F. Supp. 2d at

148 (quoting *Richardson*).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court

considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also

include that which detracts from its weight." *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct.

456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards

have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record, and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *See Parker*, 626 F.2d at 235; *see also Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs*., 705 F.2d 638, 644 (2d Cir. 1983).

  B.    Disability Determination - The Five-Step Evaluation Process

  The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* at § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* at

§§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed,

then the second step involves an examination of whether the claimant has

a severe impairment or combination of impairments which significantly

16

restricts his or her physical or mental ability to perform basic work activities.  *Id.* at §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* at §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled."  *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* at §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

17

burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

> C.    The Evidence In This Case

In support of her challenge to the Commissioner's finding of no disability, plaintiff alleges that the ALJ 1) improperly evaluated whether her condition meets or medically equals any listed, presumptively disabling condition; at step three of the analysis 2) engaged in a selective reading of plaintiff's medical records, substituting his judgment for that of her care providers; 3) failed to consider the limiting effects of her obesity; 4) erred by relying upon the opinions of a single agency consultant; and 5) improperly made use of the grid to determine disability at step five, without taking into account her non-exertional limitations and eliciting testimony of a vocational expert.

> 1.    Step Three Analysis

When there is evidence of the existence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow a special procedure at each level of administrative review.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  The Commissioner first records the pertinent

18

signs, symptoms, findings, functional limitations, and effects of treatments contained in the record.  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  *Id.* at §§ 404.1520a(b)(2), 416.920a(b)(2).  In doing so the Commissioner rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, the latter of which is incompatible with the ability to do work-like functions – analyzing four specific factors, including 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings.  *Id.* at §§ 404.1520a(c)(3), 416.920a(c)(3); *see Briest v. Commissioner*, No. 5:07-CV-121 (FJS), 2010 WL 5285307, *3 (N.D.N.Y. Dec. 17, 2010).

The Commissioner must then determine the severity of the mental impairment.  20 C.F.R. §§ 404.1520a(d), 416.920a(d)(2).  The first three areas are measured utilizing a scale ranging from mild, moderate, marked, to extreme.  *Id.* at § 416.920a(c)(4); *see Briest*, 2010 WL 5285307, *3.  The domain of deterioration in work or work-like settings is

ranked on a scale of none, one or two, three, and four or more. *See Briest*, 2010 WL 5285307, *3.

Plaintiff argues that her condition meets or equals Listing 12.04, entitled "Affective Disorders." To qualify under part (B) of that listing plaintiff's diagnosed bipolar disorder must result in two of four specified findings, including 1) marked restriction in her activities of daily living, 2) marked difficulty in social functioning ; 3) marked difficulty in concentration, and 4) repeated episodes of decompensation.[5] In the event plaintiff's condition meets the requirements of part (B), then the listing is satisfied, and plaintiff is presumptively disabled as a result of her mental condition. *See Feliciano v. Comm'r of Social Security*, No. 10-CV-3151, 2011 WL 6399512, at *6-7 (S.D.N.Y. Dec. 20, 2011). If, however, the plaintiff cannot meet the requirements of part (B), she must in turn qualify under part (C), which requires the following showing:

> Medically documented history of a chronic
> Affective Disorder of at least 2 years' duration that
> has caused more than a minimal limitation ability to
> do basic work activities, with symptoms or signs

---

[5]     Part (A) of Listing 12.04, as it relates to plaintiff's disorder, requires evidence of "[b]ipolar syndrome with a history of episodic period manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04(A). Both the ALJ and the Commissioner in his brief appear to have assumed that plaintiff's conditions satisfies this portion of Listing 12.04.

20

currently attenuated by medication or psycho-
social support and one of the following:

1.    Repeated episodes of
decompensation, each of extended
duration; or

2.    A residual disease process that
has resulted in such marginal
adjustment that even a minimal
increase in mental demands or change
in the environment would be predicted
to cause the individual to
decompensate; or

3.    Current history of 1 or more
years' inability to function outside a
highly supportive living arrangement,
with an indication of continued need for
such an arrangement.

*Briest*, 2010 WL 5285307, *3 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.04(C)) (internal quotations omitted).

In his decision ALJ Gale found that plaintiff experiences no

restriction in the activity of daily living and only mild difficulties in social

functioning as well as concentration, persistence, or pace.  AT 21-22.  The

ALJ further found no evidence of decompensation episodes of an

extended duration, concluding that the five periods of hospitalization did

not rise to a level sufficient to meet that requirement.  AT 22.  Additionally,

he summarily dismissed the requirements of paragraph (C) of Listing

21

12.04 in a single sentence, tersely concluding that "the evidence fails to establish the presence of the 'paragraph C' criteria."  AT 23.

Considering the totality of the record now before the court I conclude that the ALJ's findings regarding the part (B) criteria are not supported by substantial evidence.  While the ALJ concluded that plaintiff has no restrictions in the area of daily living, in a Psychiatric Review Technique form prepared by a disability specialist, M. Graff, Ph.D., on January 19, 2005 it was noted that plaintiff suffers from at least a mild limitation in this area.  AT 266.  Dr. Graff also found that plaintiff experiences moderate difficulties in maintaining social functioning, an area in which the ALJ found only mild difficulties, and marked difficulties in maintaining concentration, persistent or pace, as distinguished from the ALJ's finding of mild difficulties in this area.  AT 266.  Considering plaintiff's history, including suicidal ideations and planning on multiple occasions, five separate hospitalizations, fleeing the area impulsively with her two sons on two separate occasions, extended, though perhaps intermittent, psychiatric treatment from the Lewis Mental Health Center, unsuccessful attempts at working, history of cutting herself to relieve tension, consistently low GAF scores registered at various points during the

22

relevant time period, Dr. Shapiro's finding that plaintiff suffers from a poor

prognosis, and her documented record of being prescribed both

antidepressants and antipsychotic medications, all point to greater

limitations than those discerned by the ALJ.[6]

There is also evidence in the record demonstrating that the plaintiff

may well be able to meet the part (C) requirement of repeated episodes of

decompensation, each of extended duration.  The term "repeated

episodes of decompensation, each of extended duration" is defined under

the regulations as meaning "three episodes within 1 year, or an average of

once every 4 months, each lasting for at least 2 weeks", although the

regulation also allows for the possibility of such a finding with more

frequent episodes of shorter duration (or less frequent episodes of longer

duration) through use of judgment as to the effect of such episodes.   20

C.F.R. Pt. 404, Subpt. 1, App. 1 § 12.00(C)(4).  The regulations also

define episodes of decompensation as

> exacerbations or temporary increases in symptoms
> or signs accompanied by a loss of a adaptive

---

[6]      It should be noted that in December 2006, based upon plaintiff's records, a second reviewing physician, Dr. R. Altmansberger, a psychiatrist, concluded that she suffers from at least mild restriction of daily living activities and moderate restrictions in both maintaining social functioning and in maintaining concentration, persistence, or pace.  AT 310.

> functioning, as manifested by difficulties in
> performing activities of daily living, maintaining
> social relationships, or maintaining concentration,
> persistence, or pace.  Episodes of
> decompensation may be demonstrated by an
> exacerbation of symptoms or signs that would
> ordinarily require increased treatment or a less
> stressful situation (or a combination of the two).
> Episodes of decompensation may be inferred from
> medical records showing significant alteration in
> medication; or documentation of the need for a
> more structured psychological support system
> (e.g., hospitalizations, placement in a halfway
> house, or a highly structured and directing
> household); or other relevant information in the
> record about the existence, severity, and duration
> of the episode."

*Id.; see also* Social Security Administration Program Operations Manual

System ("POMS") § DI 34001.032(C)(4).

In this case the evidence that was before the agency could support

a finding of such repeated episodes of decompensation, each of extended

duration.  While plaintiff's periods of hospitalization do not fit squarely

within the definition, evidence of hospitalization, though highly relevant, is

not necessarily required for a finding of decompensation, nor must any

hospitalization last for two weeks in order to evidence such an episode.

*See Duell v. Astrue*, No.8:08-CV-9, 2010 WL 87298 at *7 and n.9

(N.D.N.Y. Jan. 5, 2010) (Hurd, J. and Bianchini, M.J.) ( noting that

"[e]pisodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.") (quoting *Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008)) (internal quotation omitted).  In this instance, plaintiff was hospitalized for five days in January 2007 and again for ten days in October 2007.  AT 318-413; 466-526.  On both occasions plaintiff entered inpatient treatment with a GAF score of 30 or less and expressed a desire to harm herself or others. AT 326-28, 466-69.  The ALJ's decision fails to offer an explanation of his rejection of the paragraph (C) criteria sufficient to permit a reviewing court to determine whether that finding is supported by substantial evidence.

In sum, in addition to the fact the record does not support the ALJ's conclusions regarding paragraph (B) of Listing 12.04, the ALJ offered no meaningful analysis in his decision whatsoever regarding the paragraph (C) criteria.  This was error and alone requires reversal and a remand of the matter to the agency for further consideration.  *Briest,* 2010 WL 5285307, * 4.

2.   RFC Finding and Use of the Grid

25

Plaintiff next asserts that even if the ALJ's step three finding is supported by substantial evidence, he nonetheless erred in not considering the non-exertional limitations presented by plaintiff's diagnosed mental condition when formulating his RFC finding, and by not calling upon a vocational expert, but instead resorting to use of the grid to determine the availability of work which plaintiff is capable of performing.

The ALJ's finding of no disability hinges upon his RFC determination. A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id*.; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess that person's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must

26

also be considered.  20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20

C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC

determination, an ALJ must specify those functions which the claimant is

capable of performing; conclusory statements concerning his or her

capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150

(citing *Ferraris,* 728 F.2d at 587).  An administrative RFC finding can

withstand judicial scrutiny only if there is substantial evidence in the record

to support each requirement listed in the regulations.  *Martone*, 70 F.

Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183

(N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10

(E.D.N.Y. 1997).

　　　Plaintiff does not quarrel with the exertional aspects of the ALJ's

RFC finding.  She maintains, however, that the RFC finding fails to take

into account the non-exertional limitations imposed by her severe mental

condition.  Plaintiff's bipolar disorder is well-diagnosed, and the intensive

treatment she has received over time is amply chronicled in her medical

records.  The impact of the condition on her ability to perform work-related

functions is manifest from the repeated hospitalizations and intensive

treatment which the plaintiff has undergone, her history of cutting herself

27

to relieve tension, and her several unsuccessful part-time employment
attempts.  Plaintiff testified that she is short-tempered and that this trait
keeps her from being able to work.  AT 569-72.  Plaintiff is also forgetful
and changes moods quickly.  AT 571.  Plaintiff believes that were she to
work she would become overwhelmed due to her anxiety, nervousness,
and depression.  AT 581.  According to an agency psychological review,
plaintiff suffers from a marked limitation in her ability to understand and
remember detailed instructions as well as moderate limitations in ten of
nineteen other work-related functions.  AT 270-71.  These non-exertional
limitations presented by plaintiff's condition are not fully reflected in the
ALJ's RFC finding, thereby providing yet another basis for reversal.

     The ALJ's error in formulating plaintiff's RFC was compounded by
his resort to the grid rather than using a vocational expert to assess
plaintiff's ability to perform available work.  Ordinarily, the Commissioner
can meet his burden in connection with the fifth step of the relevant
disability test by utilizing the grid.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d
Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  The grid
takes into consideration a claimant's RFC, as well as his or her age,
education, and work experience, in order to determine whether he or she

can engage in substantial gainful work in the national economy.  *Rosa*, 168 F.3d at 78.  Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605. If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grid is inappropriate, in which case further evidence and/or testimony is required.[7]  *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06.  A claimant's work capacity is significantly diminished if her capacity is to work is limited by her nonexertional limitations to such an extent that the possible range of work becomes so narrow that it effectively deprives the claimant of a meaningful employment opportunity.  *Malone v. Comm'r of Social Security,* No. 08-CV-1249, 2011 WL 817448, at * 9 (N.D.N.Y. Jan. 18, 2011) (Bianchini,

---

[7]     As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

*Sobolewski*, 985 F. Supp. at 310 (citing 20 C.F.R. § 404.1569(a), (c)).

M.J.) (citing *Pratts*, 802 F.2d at 605-06)*, report and recommendation adopted*, 2011 WL 808378 (N.D.N.Y. Mar. 2, 2011) (Sharpe, J.).

> "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. "A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.*; SSR 96-9p ("When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.")

*Malone*, 2011 WL 817448, at * 9.

Despite evidence in the record suggesting that plaintiff has moderate limitations in the majority of work-related functions that were evaluated, the ALJ concluded that plaintiff could perform work at all exertional levels.  As was previously indicated, the evidence strongly suggests that plaintiff's non-exertional limitations attributable to her mental condition do in fact significantly limit the range of work she can perform, thereby eroding the range of jobs on which the grid is predicated and making it necessary for the Commissioner to elicit testimony from a vocational expert as to the jobs that exist in the economy which plaintiff can obtain and perform in order to meet his burden at step five of the

NEED HEADER

disability analysis.  *Lomas v. Comm'r Social Security*, No. 09-CV-1451,

2011 WL 2359360, *3 (E.D.N.Y. Jun. 6, 2011); *see also Malone*, 2011 WL

817448, at * 9*; Pearson v. Astrue*, No. 1:10–CV–00521, 2012 WL 527675,

at * 13 (N.D.N.Y. Feb. 17, 2012) (D'Agostino, J.).

3.   <u>Obesity</u>

The plaintiff also challenges the ALJ's failure to consider her obesity

in assessing her ability to perform work-related functions.  When

considering whether a claimant's impairment meets or equals one or more

of the conditions listed in the regulations, that person's obesity and its

effects in combination with musculoskeletal impairments must be

considered, in the context of the specifics of the claimant's

circumstances.[8]  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00(Q); *see*

*also* SSR 02-1p; *Orr v. Barnhart,* 375 F. Supp. 2d 193, 199 (W.D.N.Y.

2005).  As the regulations observe,

> [o]besity is a medically determinable impairment
> that is often associated with disturbance of the
> musculoskeletal system, and disturbance of this
> system can be a major cause of disability in
> individuals with obesity.  The combined effects of
> obesity with musculoskeletal impairments can be

---

[8]   Obesity in and of itself was eliminated as a listed disability in October of
1999.  *See* Social Security Ruling 00-3p.  Its description as a potential contributing
factor is now referenced in section 1.00(Q) of the listings.

> greater than the effects of each of the impairments
> considered separately.  Therefore, when
> determining whether an individual with obesity has
> a listing-level impairment or combination of
> impairments, and when assessing a claim at other
> steps of the sequential evaluation process,
> including when assessing an individual's residual
> functional capacity, adjudicators must consider any
> additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(Q).

Undeniably, plaintiff's medical records are strongly suggestive of

obesity.  *See, e.g.,* AT 421-27.  The mere presence of a disease or

impairment alone, however, is insufficient to establish disability; instead, it

is the impact of the disease, and in particular any limitations which it may

impose upon the ability to perform basic work functions, that is pivotal to

the disability inquiry.  *See Rivera v. Harris,* 623 F.2d 212, 215-16 (2d Cir.

1980); *Coleman v. Shalala,* 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

Based upon a review of the record, I am unable to find any

indication that plaintiff's weight, which has fluxuated over time, has

presented an impairment that would limit her ability to perform work-

related functions.  Nowhere in the record is there evidence that a treating

source has identified limitations associated with plaintiff's obesity or

prescribed a course of treatment to address her weight issues.  This

conclusion is reinforced by plaintiff's own hearing testimony, during which she candidly stated that her physical condition plays no role in precluding her from working. *See* AT 583. I therefore find that the ALJ did not err in failing to account for any physical limitations associated with plaintiff's obesity.

## IV.    SUMMARY AND RECOMMENDATION

Plaintiff's documented diagnosis of bipolar disorder, coupled with her several periods of hospitalization, chronically low GAF scores, ongoing psychiatric treatment and medication, unsuccessful attempts at part-time employment, and history of suicidal ideation and cutting herself to relieve tension, all convincingly establish that her non-exertional limitations present significant impediments to working. Having carefully reviewed the ALJ's decision in this case, I conclude that in his decision finding no disability he failed to 1) make a proper analysis at step three of the controlling disability test, 2) properly identify the contours of plaintiff's RFC, and 3) elicit vocational expert testimony in order to carry the Commissioner's burden at step five and to establish the availability of jobs suitable for the plaintiff. I will therefore recommend that the matter be

remanded to the Commissioner for further consideration.[9]  Accordingly, it

is hereby

RECOMMENDED that defendant's motion for judgment on the

pleadings be DENIED, plaintiff's motion for judgment on the pleadings be

GRANTED, the Commissioner's finding of no disability be VACATED, and

the matter REMANDED to the Commissioner for further proceedings

consistent with the court's findings.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

_____

[9]        When setting aside a decision of the Commissioner finding no disability,
a court is faced with the choice of directing a finding of disability and remanding solely
for a calculation of benefits or instead remanding for further findings.  Reversal and
remand for the calculation of benefits, is only warranted "when there is 'persuasive
proof of disability' [in the record] and further development of the record would not serve
any purpose." *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006)
(quoting *Rosa*, 168 F.3d at  83).  Remand for further consideration, on the other hand,
is justified when the ALJ has applied an improper legal standard, or further findings
and explanations would clarify the ALJ's decision.  *See Rosa,* 168 F.3d at 82-83;
*Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980); *Steficek*, 462 F. Supp. 2d at 418
(citing *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996)).  In this instance, while the
record contains evidence suggesting a finding of disability, remand is required for the
purpose of making further findings and offering additional explanations of the
evidence, and not because I have found that there is persuasive proof of disability in
the existing record.

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

_____
David E. Peebles
U.S. Magistrate Judge

Dated:      March 5, 2012
            Syracuse, NY

35